## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>Plaintiff,<br><br>v.<br><br>**NEXWAY SASU**, a corporation,<br><br>**NEXWAY GROUP AG**, a corporation,<br><br>**ASKNET SOLUTIONS AG**, a corporation, (formerly ASKNET AG and NEXWAY AG),<br><br>**NEXWAY, INC.**, a corporation,<br><br>**ASKNET, INC.**, a corporation,<br><br>**VICTOR IEZUITOV**, also d/b/a VICTOR LEZUITOV, individually and as an officer of NEXWAY SAS, NEXWAY GROUP AG, ASKNET AG, and NEXWAY AG; and<br><br>**CASEY POTENZONE**, individually and as an officer of NEXWAY SAS, NEXWAY GROUP AG, ASKNET AG, and NEXWAY AG,<br><br>Defendants. | **Case No. 1:23-cv-00900-TNM**<br><br>**STIPULATED ORDER FOR PERMANENT INJUNCTION AND MONETARY JUDGMENT AND OTHER RELIEF AS TO DEFENDANTS NEXWAY SASU, NEXWAY GROUP AG, NEXWAY, INC. AND VICTOR IEZUITOV** |

Plaintiff, the United States of America, filed its Complaint for a Permanent Injunction, Monetary Relief, and other Relief ("Complaint") for a permanent injunction, monetary relief, civil penalties, and other relief in this matter, pursuant to Sections 13(b), and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b), and 57b. Defendants Nexway SASU, Nexway Group AG, and Nexway, Inc. have waived service of the summons and the Complaint. The United States and the Defendants stipulate to the entry of this Stipulated Order for Permanent Injunction

and Monetary Judgment ("Order") to resolve all matters in dispute in this action between them.

THEREFORE, IT IS ORDERED as follows:

## FINDINGS

1.      This Court has jurisdiction over this matter.

2.      The Complaint charges that the Defendants participated in deceptive and unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45, and the Telemarketing Sales Rule, 16 C.F.R. Part 310, by (1) submitting charges through Nexway's account for an entity, Tech Live Connect, that made false statements to consumers, (2) assisting and facilitating Tech Live Connect's unlawful scheme involving making misrepresentations to consumers about the safety and performance of their computers, and (3) laundering Tech Live Connect's charges through the credit card system. The Defendants engaged in the violations with knowledge or conscious avoidance of knowledge of Tech Live Connect's unlawful practices.

3.      The Defendants neither admit nor deny any of the allegations in the Complaint, except as specifically stated in this Order.  Only for purposes of this action, the Nexway Defendants admit the facts necessary to establish jurisdiction.

4.      The Defendants waive any claim that they may have under the Equal Access to Justice Act, 28 U.S.C. § 2412, concerning the prosecution of this action through the date of this Order, and agree to bear their own costs and attorney fees.

5.      The Defendants and the United States waive all rights to appeal or otherwise challenge or contest the validity of this Order.

## DEFINITIONS

For the purpose of this Order, the following definitions apply:

A.      "**ACH Debit**" means any completed or attempted debit to a Person's account at a

2

financial institution that is processed electronically through the Automated Clearing House Network.

B.  "**ACH Transaction**" means any transaction involving a Person's account at a financial institution that is processed electronically through the ACH Network.

C.  "**Acquirer**" means a business organization, financial institution, or an agent of a business organization or financial institution that has authority from an organization that operates or licenses a credit card system (*e.g.* VISA, MasterCard, American Express, or Discover) to authorize Merchants to accept, transmit, or process payments by credit card through the credit card system, for money, goods or services, or anything else of value.

D.  "**Automated Clearing House Network**" or "**ACH Network**" means the electronic funds transfer system governed by the NACHA Rules that provide for the interbank clearing of credit and debit entries to accounts at financial institutions.

E.  "**Chargeback**" means a procedure whereby an issuing bank or other financial institution charges all or part of an amount of a Person's credit or debit card transaction back to the Acquirer or merchant bank.

F.  "**Chargeback Rate**" means the proportion (expressed as a percentage) of chargebacks out of the total number of attempted credit or debit card sales transactions.

G.  "**Client**" means any person, corporation, originator, or other entity, including, but not limited to, Merchants and Independent Sales Organizations with whom any Defendant has contracted or agreed to provide Payment Processing services at any point in time.

H.  "**Corporate Defendant**" means Nexway SASU, Nexway Group AG, and Nexway, Inc., and their successors and assigns.

I.  "**Credit Card Sales Draft**" means any record or evidence of a credit card

transaction.

J.    "**Credit Card System**" means any method or procedure used to process credit card transactions involving credit cards issued or licensed by the operator of that system.

K.    "**Defendants**" means Corporate Defendants, and Victor Iezuitov, individually, collectively, or in any combination.

L.    "**High Risk Client**" means any Client that (a) engages in Telemarketing, (b) markets or sells a Technical Support Product or Service or (c) has previously been named in a complaint, settlement, or assurance of voluntary compliance involving the Federal Trade Commission ("Commission" or "FTC"), another federal law enforcement agency, or a state attorney general in a case or matter involving fraud, or unfair, deceptive or abusive practices, including, but not limited to, Section 5 of the FTC Act, 15 U.S.C. § 45 and the Telemarketing Sales Rule, 16 C.F.R. Part 310, or a violation of any other state or federal consumer protection law, and where the complaint, settlement, or assurance of voluntary compliance is available, viewable or accessible through a search of at least one major Internet search engine selected by Defendants.

M.    "**Individual Defendant**" means Victor Iezuitov, also dba Victor Lezuitov.

N.    "**Independent Sales Organization**" or "**ISO**" means any Person, corporation, organization, or other entity that solicits, matches, arranges, or refers Payment Processing Services for Clients, or that solicits, matches, arranges, or refers Clients for Payment Processing Services, or is registered as an ISO or merchant service provider with Visa, MasterCard, or any credit card association.

O.    "**Merchant**" means a Person who is authorized under a written contract with an Acquirer to honor or accept credit cards, or to transmit or process for payment credit card payments for the purchase of goods or service or a charitable contribution or who uses a Payment Processor

or an Originating Depository Financial Institution to directly or indirectly submit ACH Transactions into the ACH Network, directly or indirectly submit Remotely Created Payment Orders through the banking system.

P.    "**NACHA**" means the National Automated Clearing House Association.

Q.    "**NACHA Rules**" mean the NACHA Operating Rules, as amended from time to time.

R.    "**ODFI**" or "**Originating Depository Financial Institution**" means a financial institution that submits ACH Transactions into the ACH Network.

S.    "**Payment Processing**" means transmitting sales transaction data on behalf of a Merchant or providing a Person, directly or indirectly, with the means used to charge, debit or credit accounts through the use of any payment method or mechanism, including, but not limited to, credit cards, debit cards, prepaid cards, stored value cards, ACH transactions, ACH debits, and Remotely Created Payment Orders. Whether accomplished through the use of software or otherwise, Payment Processing includes, among other things: (a) reviewing and approving Merchant applications for payment processing services; (b) transmitting Merchants' sales transaction data or providing the means to transmit Merchants' sales transaction data to Acquirers, ODFI's, Payment Processors, ISOs, or other financial institutions; (c) clearing, settling, or distributing proceeds of sales transactions from acquiring banks or financial institutions to Merchants, directly or indirectly; or (d) processing ACH Transactions, Refunds, credit card transactions, Chargebacks, Remotely Created Payment Orders or returned Remotely Created Payment Orders.

T.    "**Payment Processor**" means any Person providing Payment Processing services in connection with another Person's sale of goods or services, or in connection with

any charitable donation.

U.     "**Person**" means any natural person or any entity, corporation, partnership, or association of persons.

V.     "**Refund**" means a transaction whereby a consumer contacts the Seller, Telemarketer or Payment Processor directly and money is returned to the consumer, or a sale or charge is reversed or cancelled;

W.     "**Remotely Created Payment Order**" means a payment instruction or order, whether created in electronic or paper format, drawn on a payor's financial account that is initiated or created by the payee, and which is deposited into or cleared through the check clearing system. For purposes of this definition, an account includes any financial account or credit or other arrangement that allows checks, payment instructions, or orders to be drawn against it that are payable by, through, or at a bank.

X.     "**Sales Agent**" means a Person that matches, arranges, or refers prospective Clients or Clients to a Payment Processor or ISO for Payment Processing, but does not hold any contractual liability in the event of losses related to the Payment Processing activities conducted by or on behalf of Clients. As such, a Sales Agent may be involved in recommending a particular Payment Processor or ISO to a prospective Client, forwarding to the Payment Processor or ISO a prospective Client's or Client's merchant application, or negotiating rates and fees charged by a Payment Processor or ISO, but a Sales Agent may not be involved in any Payment Processing and may not act as an ISO.

Y.     "**Tech Live Connect**" means the entity referred to as Tech Live Connect and any company and dba names associated with such entity, its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, including

6

but not limited to: Tech Live Connect Pte Ltd, Sensei Ventures, Inc., Saburi TLC, and Premium Techie Support.

Z. "**Technical Support Product or Service**" means any software or service marketed to repair, maintain or improve a computer's performance or security, including registry cleaners, anti- virus programs and computer or software diagnostic services without regard to whether the service is being offered by persons communicating by an inbound or outbound telephone call, online or in-person.

AA. "**Telemarketing** means a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call. The term does not include the solicitation of sales through the mailing of a catalog which: contains a written description or illustration of the goods or services offered for sale; includes the business address of the seller; includes multiple pages of written material or illustrations; and has been issued not less frequently than once a year, when the person making the solicitation does not solicit customers by telephone but only receives calls initiated by customers in response to the catalog and during those calls takes orders only without further solicitation. For purposes of the previous sentence, the term "further solicitation" does not include providing the customer with information about, or attempting to sell, any other item included in the same catalog which prompted the customer's call or in a substantially similar catalog.

BB. "**Telemarketing Sales Rule**" or "**TSR**" means 16 C.F.R. Part 310.

CC. "**Total Return Rate**" means the proportion (expressed as a percentage) of all attempted ACH Debit or RCPO transactions that are returned through the banking system for any reason, whether before or after payment, out of the total number of such attempted transactions,

calculated separately for each type of transaction.

## ORDER

### I.      PROHIBITION ON PROCESSING FOR ANY PERSON ENGAGED IN MARKETING TECHNICAL SUPPORT PRODUCTS OR SERVICES

IT IS ORDERED that Defendants are permanently restrained and enjoined from Payment Processing for any Person, whether directly or through any intermediary, who markets, offers for sale or sells a Technical Support Product or Service by (1) Telemarketing; (2) false or unsubstantiated advertising; or (3) pop up messages relating to the security or performance of a computer.

Provided, however, this ban does not apply when a (1) Person is solely providing access to a live agent through a pop up after an initial sale in order to provide information about how to use a product or service, or how to cancel or seek a refund for any purchase of a product or service; and (2) the pop up's message does not include any representation related to the security or performance of the computer.

### II.      PROHIBITION ON MISREPRESENTATIONS AND ASSISTING OTHERS

IT IS FURTHER ORDERED that the Defendants, the Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with promoting or offering for sale any good or service, are permanently restrained and enjoined from:

A.      Misrepresenting, expressly or by implication the performance or security of a computer, or any other fact material to consumers concerning any good or service, such as: the total costs; any material restrictions, limitations, or conditions; the name of the service provider; or any material aspect of its performance, efficacy, nature, or central characteristics; or

B.      Assisting, including Payment Processing for or with, any Person who

8

misrepresents, expressly or by implication the performance or security of a computer, or any other fact material to consumers concerning any good or service, such as: the total costs; any material restrictions, limitations, or conditions; the name of the service provider; or any material aspect of its performance, efficacy, nature, or central characteristics.

### III.    INJUNCTION CONCERNING THE TELEMARKETING SALES RULE

IT IS FURTHER ORDERED that Defendants and Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the sale of any good or service are hereby permanently restrained and enjoined:

A.    From presenting to or depositing into, or causing another to present to or deposit into, the Credit Card System for payment, a Credit Card Sales Draft generated by a Telemarketing transaction that is not the result of a Telemarketing credit card transaction between the cardholder and Merchant in violation of Section 310.3(c)(l) of the TSR, 16 C.F.R. § 310.3(c)(l); and

B.    From violating the TSR, a copy of which is attached as Attachment A.

## IV.    SCREENING OF PROSPECTIVE HIGH RISK CLIENTS

IT IS FURTHER ORDERED that Defendants, Defendants' officers, agents, servants, employees, and all other Persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are permanently restrained and enjoined from acting as a Payment Processor, ISO or Sales Agent for any prospective High Risk Client without first engaging in a reasonable screening of the prospective High Risk Client to determine whether the prospective High Risk Client's business practices are, or are likely to be, deceptive or unfair within the meaning of Section 5 of the FTC Act, or a violation of the Telemarketing Sales Rule.  Such reasonable screening shall include, but not be limited to:

A.    Establishing and maintaining policies and procedures designed to identify prospective Merchants who may seek to become High Risk Clients.

B.    Where Defendants receive information that a Merchant may be a prospective High Risk Client, obtaining from each prospective High Risk Client, including the principal(s) and controlling Person(s) of the entity, any Person(s) with a majority ownership interest in the entity, and any corporate name, trade name, fictitious name or alias under which such Person(s) conduct or have conducted business:

1.    A description of the nature of the prospective High Risk Client's business, including describing the nature of the goods and services sold and methods of sale, for which the prospective High Risk Client seeks Payment Processing services;

2.    Scripts, copies of Internet websites, and other marketing materials;

3.    The name of the principal(s) and controlling Person(s) of the entity, and Person(s) with a majority ownership interest in the entity;

4.    A list of all business and trade names, fictitious names, dba's and

10

Internet websites under or through which the prospective High Risk Client has marketed or intends to market the goods and services for which the prospective High Risk Client seeks Payment Processing services;

5.      Each physical address at which the prospective High Risk Client has conducted business or will conduct the business(es) identified pursuant to subsection (1) of this Section IV.A;

6.      The name and address of every Acquirer, Payment Processor and ODFI used by the prospective High Risk Client during the preceding two years, and all merchant account numbers, ACH company names, and Merchant identification numbers used by any such banks or Payment Processors in connection with the prospective High Risk Client, and obtaining documents or information from each entity to determine whether the High Risk Client is still using their service, or has been terminated or a contract was not renewed, and the reasons for the termination and non-renewal;

7.      The prospective High Risk Client's past Chargeback Rate (in the case of credit card transactions) and Total Return Rate (in the case of ACH Transactions or RCPO transactions) and for the preceding 12 months and estimates of future Chargeback Rates (in the case of credit card transactions) and Total Return Rates (in the case of ACH Transactions or RCPO transactions);

8.      The names of trade and bank references; and

9.      Whether the prospective High Risk Client, including the principal(s) and controlling Person(s) of the entity, any Person(s) with a majority ownership interest in the entity, and any corporate name, trade name, fictitious name or alias under which such Person(s) conduct or have conducted business, has ever been:

a.      placed in a payment card association's chargeback monitoring program during the preceding 2 years;

b.      terminated by a Payment Processor, Acquirer, financial institution, ODFI, or operator of a payment system due to excessively high Chargeback Rates or Total Return Rates; or

c.      the subject of a complaint filed by the Federal Trade Commission ("Commission") or any other state or federal law enforcement agency.

C.      Taking reasonable steps to assess the accuracy of the information provided pursuant to Section IV.B of this Order, including but not limited to: reviewing the Internet websites used by the prospective High Risk Client to market its goods or services; obtaining and reviewing copies of monthly Payment Processing statements issued by any bank, ODFI, Payment Processors, ISO, Sales Agent, or Acquirer used by the High Risk Client during the preceding 6 months; obtaining all current marketing materials, including Telemarketing scripts and copies of Internet websites, for each good or service related to the offer for which Defendants would provide the prospective High Risk Client with Payment Processing, and reviewing such materials, (or, in the case of a High Risk Client that refuses to confirm the production of all current materials, refusing to provide Payment Processing for the prospective High Risk Client). The purpose of such steps is to determine whether the prospective High Risk Client is engaged in any of the following acts or practices, in which case Defendants shall not provide Payment Processing for the prospective High Risk Client:

1.      Failing to clearly and conspicuously disclose all products and services that are sold in conjunction with the offered product or service, and the total cost to purchase, receive, or use, any product or services that are the subject of the sales offer;

2.      Misrepresenting any material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of the sales offer;

3.      Failing to clearly and conspicuously disclose all material terms and conditions of an offer;

4.      Misrepresenting, expressly or by implication, any material aspect of the prospective High Risk Client's refund, cancellation, exchange, or repurchase policies;

5.      Causing billing information to be submitted for payment without the customer's express authorization; or

6.      Violating the TSR.

## V.      MONITORING OF HIGH RISK CLIENTS

IT IS FURTHER ORDERED that Defendants, Defendants' officers, agents, servants, employees, and all other Persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with Payment Processing, are permanently restrained and enjoined from:

A.      Failing to monitor the sales activity of all existing Clients to identify existing Clients that should be designated as High Risk Clients requiring additional screening pursuant to Section IV of this order, and for all newly-designated and newly-onboarded High Risk Clients, failing to complete the reasonable screening process described in Section IV of the Order within 30 days after the effective date of this Order;

B.      Failing to monitor each High Risk Client's transactions to determine whether the High Risk Client is engaged in practices that are deceptive or unfair in violation of Section 5 of the FTC Act or the TSR. Such monitoring shall include, but not be limited to:

1.      Regularly reviewing High Risk Clients' Internet websites from an IP

address that is not associated with Defendants and saving copies of such websites;

2.       Regularly reviewing Chargeback Rates (in the case of credit card transactions) and Total Return Rates (in the case of ACH Transactions or RCPO transactions) and reasons provided for these Chargebacks and returned transactions, as well as examining any unusual or suspect transaction patterns, values, and volume;

3.       Regularly obtaining, saving, and reviewing all marketing materials (including sales scripts);

4.       Conducting monthly test calls to determine what representations are being made to consumers and what goods or services are being sold.

C.       Failing to calculate and update at least on a monthly basis for each High Risk Client the Chargeback Rate (in the case of credit card transactions) and the Total Return Rate (in the case of ACH Transactions and RCPO transactions).  For any High Risk Client with multiple processing accounts with the Defendants, the calculation of the Chargeback Rate and the Total Return Rate shall be made for each High Risk Client's individual processing accounts, and in the aggregate for each High Risk Client;

D.       Failing to immediately conduct a reasonable investigation of the High Risk Client for any High Risk Client (a) who, in two of the past six months, had a monthly Chargeback Rate in excess of 1% and more than 40 Chargebacks in a month; or (b) whose Total Return Rate exceeds 2.5%.  A reasonable investigation includes, but is not limited to:

1.       Verifying and updating the truth and accuracy of information gathered in compliance with Section IV of this Order and any other advertising of the High Risk Client;

2.       Confirming that the High Risk Client has obtained required consumer authorizations for the transactions and verifying the legitimacy of such authorizations;

14

3.      Contacting financial institutions and Better Business Bureaus together detailed information, including complaints and other relevant information, regarding the High Risk Client;

4.      Reviewing from an IP address that is not associated with Defendants the Internet websites used by the High Risk Client to market its goods and services; searching publicly available sources for legal actions taken by the Commission or other state or federal law enforcement agencies against the High Risk Client; and

5.      Conducting "test" shopping to determine the High Risk Client's sales practices.

E.      During the investigation, Defendants shall suspend any Payment Processing services for any High Risk Client under investigation;

F.      Stop processing sales transactions and failing to close all processing accounts for any High Risk Client investigated pursuant to Subsection D, above, within 60 days of commencing the investigation, unless Defendants draft a written report establishing facts that demonstrate, by clear and convincing evidence, that the High Risk Client's business practices related to the offer(s) for which Defendants provide Payment Processing are not deceptive or unfair in violation of Section 5 of the FTC Act and are not in violation of the Telemarketing Sales Rule;

G.      Failing immediately to stop processing sales transactions and close all processing accounts for any High Risk Client that Defendants know or should know is engaged in tactics to avoid fraud and risk monitoring programs established by any financial institution, Acquirer, ODFI, or the operators of any payment system, including, but not limited to, balancing or distributing sales transaction volume or sales transaction activity among multiple

Merchant Accounts or merchant billing descriptors; splitting a single sales transaction into multiple smaller transactions, or using shell companies to apply for additional bank accounts or Merchant Accounts; and

H.      Nothing in this Section shall be read to insulate the Defendants from liability for a violation of Section 5 of the FTC Act, the TSR or any other provisions of this Order.

## VI.    MONETARY JUDGMENT

IT IS FURTHER ORDERED that:

A.      Judgment in the amount of **Sixteen Million Five Hundred Thousand Dollars ($16,500,000)** is entered in favor of the United States against Defendants Nexway SASU, Nexway Group AG, Nexway, Inc., and Victor Iezuitov, jointly and severally as monetary relief.

B.      Defendants Nexway SASU, Nexway Group AG, and Nexway, Inc. are ordered to pay a total of **Three Hundred Fifty Thousand Dollars ($350,000)** to the  United States**,** which, as the Corporate Defendants stipulate, their undersigned counsel holds in escrow for no purpose other than payment to the United States.   Such payment must be made within 7 days of entry of this Order by electronic fund transfer in accordance with instructions previously provided by a representative of the United States.  Upon such payment, the remainder of the judgment as to the Corporate Defendants is suspended subject to the Subsections below.

C.      The United States' agreement to the suspension of part of the judgment is expressly premised upon the truthfulness, accuracy, and completeness of the Corporate Defendants' sworn financial statements and related documents (collectively, "financial representations") submitted to the Commission, namely:

1.      Sworn Financial Statements for the Corporate Defendants and attachments dated April 8, 2022;

2. A balance sheet of Nexway Group AG, as of March 31, 2022, and a statement for the period ended April 30, 2022 for a Nexway, Inc. bank account with Wise, Inc.; and

3. Documents produced on October 27, 2022, including information about reserve accounts.

D. The suspension of the judgment against the Corporate Defendants will be lifted if, upon motion by the United States, the Court finds that any of the Corporate Defendants failed to disclose any material asset, materially misstated the value of any asset, or made any other material misstatement or omission in the financial representations identified above.

E. If the suspension of the judgment is lifted, the judgment becomes immediately due as to the Corporate Defendants in the amount specified in Subsection A. above (which the parties stipulate only for purposes of this Section represents the consumer injury alleged in the Complaint), less any payment previously made pursuant to this Section, plus interest computed from the date of entry of this Order.

F. Defendant Iezuitov is ordered to pay **One Hundred Thousand Dollars ($100,000)** to the United States**,** which, as he stipulates, his undersigned counsel holds in escrow for no purpose other than payment to the United States. Such payment must be made within 7 days of entry of this Order by electronic fund transfer in accordance with instructions previously provided by a representative of the United States. Upon such payment, the remainder of the judgment as to Defendant Iezuitov is suspended subject to the Subsections below.

G. The United States' agreement to the suspension of part of the judgment is expressly premised upon the truthfulness, accuracy, and completeness of the Defendant Iezuitov's sworn financial statements and related documents (collectively, "financial representations") submitted to the Commission, namely the Sworn Financial Statement and attachments signed December 2,

2022.

H.      The suspension of the judgment against Defendant Iezuitov will be lifted if, upon motion by the United States, the Court finds that Defendant Iezuitov failed to disclose any material asset, materially misstated the value of any asset, or made any other material misstatement or omission in the financial representations identified above.

I.      If the suspension of the judgment is lifted, the judgment becomes immediately due as to the Defendant Iezuitov in the amount specified in Subsection A. above (which the parties stipulate only for purposes of this Section represents the consumer injury alleged in the Complaint), less any payment previously made pursuant to this Section, plus interest computed from the date of entry of this Order.

## VII.   ADDITIONAL MONETARY PROVISIONS

IT IS FURTHER ORDERED that:

A.      Defendants relinquish dominion and all legal and equitable right, title, and interest in all assets transferred pursuant to this Order and may not seek the return of any assets.

B.      The facts alleged in the Complaint will be taken as true, without further proof, in any subsequent civil litigation by or on behalf of the United States, including in a proceeding to enforce its rights to any payment or monetary judgment pursuant to this Order, such as a nondischargeability complaint in any bankruptcy case.

C.      The facts alleged in the Complaint establish all elements necessary to sustain an action by the United States pursuant to Section 523(a)(2)(A) of the Bankruptcy Code, 11 U.S.C. § 523(a)(2)(A), and this Order will have collateral estoppel effect for such purposes.

D.      Defendants agree that any portion of the judgment which represents a civil penalty owed to the government of the United States, is not compensation for actual pecuniary loss, and,

therefore, as to Defendants Nexway SASU, Nexway Group AG, Nexway, Inc., and Victor Iezuitov it is not subject to discharge under the Bankruptcy Code pursuant to 11 U.S.C. § 523(a)(7).

E.      Defendants acknowledge that their Taxpayer Identification Numbers (Social Security Numbers or Employer Identification Numbers), may be used for collecting and reporting on any delinquent amount arising out of this Order, in accordance with 31 U.S.C. §7701.

F.      All money received by the United States pursuant to this Order may be deposited into a fund administered by the Commission or its designee to be used for consumer redress and any attendant expenses for the administration of any redress fund.  If a representative of the Commission decides that direct redress to consumers is wholly or partially impracticable or money remains after redress is completed, the Commission may apply any remaining money for such other equitable relief (including consumer information remedies) as it determines to be reasonably related to Defendants' practices alleged in the Complaint.  Any money not used for such relief is to be deposited to the U.S. Treasury. Defendants have no right to challenge any actions the Commission or its representatives may take pursuant to this Subsection.

## VIII.    CUSTOMER INFORMATION

IT IS FURTHER ORDERED that Defendants, Defendants' officers, agents, servants, employees, and all other Persons in active concert or participation with any of them are permanently restrained and enjoined from directly or indirectly:

A.      Failing to provide sufficient customer information to enable the Commission to efficiently administer consumer redress. Defendants represent that they have provided this redress information to the Commission. If a representative of the Commission requests in writing any information related to redress, Defendants must provide it, in the form prescribed by the Commission, within 14 days.

B.    Disclosing, using, or benefitting from customer information, including the name, address, telephone number, email address, social security number, other identifying information, or any data that enables access to a customer's account (including a credit card, bank account, or other financial account), that any Defendant obtained prior to entry of this Order in connection with Payment Processing and

C.    Failing to destroy such customer information in all forms in their possession, custody, or control within 30 days after receipt of written direction to do so from a representative of the Commission.

Provided, however, that customer information need not be disposed of, and may be disclosed, to the extent requested by a government agency or required by law, regulation, or court order.

## IX.    COOPERATION

IT IS FURTHER ORDERED that each Defendant must fully cooperate with representatives of United States and the Commission in this case and in any investigation related to or associated with the transactions or the occurrences that are the subject of the Complaint. Such Defendants must provide truthful and complete information, evidence, and testimony.  Defendants must cause Defendants' officers, employees, representatives, or agents to appear for interviews, discovery, hearings, trials, and any other proceedings that a United States or Commission representative may reasonably request upon 10 days written notice, or other reasonable notice, at such places and times as a United States or Commission representative may designate, without the service of a subpoena.

## X.    ORDER ACKNOWLEDGMENTS

IT IS FURTHER ORDERED that Defendants obtain acknowledgments of receipt of this Order:

A.    Each Defendant, within 7 days of entry of this Order, must submit to the Commission an acknowledgment of receipt of this Order sworn under penalty of perjury.

B.    For 5 years after entry of this Order, each Defendant, must deliver a copy of this Order to: (1) all principals, officers, directors, and LLC managers and members; (2) all employees having managerial responsibilities for conduct related to the subject matter of the Order and all agents and representatives who participate in conduct related to the subject matter of the Order; and (3) any business entity resulting from any change in structure as set forth in the Section titled Compliance Reporting. Delivery must occur within 7 days of entry of this Order for current personnel. For all others, delivery must occur before they assume their responsibilities.

C.    From each individual or entity to which a Defendant delivered a copy of this Order, that Defendant must obtain, within 30 days, a signed and dated acknowledgment of receipt of this Order.

## XI.    COMPLIANCE REPORTING

IT IS FURTHER ORDERED that Defendants make timely submissions to the Commission:

A.    One year after entry of this Order, each Defendant must submit a compliance report, sworn under penalty of perjury:  Each Defendant must: (a) identify the primary physical, postal, and email address and telephone number, as designated points of contact, which representatives of the Plaintiff may use to communicate with Defendant; (b) identify all of that Defendant's businesses by all of their names, telephone numbers, and physical, postal, email, and Internet addresses; (c) describe the activities of each business, including the goods and services offered,

the means of advertising, marketing, and sales, and the involvement of any other Defendant (which Defendants must describe if they know or should know due to their own involvement); (d) describe in detail whether and how that Defendant is in compliance with each Section of this Order; and (e) provide a copy of each Order Acknowledgment obtained pursuant to this Order, unless previously submitted to the Commission.

B.     For 20 years after entry of this Order, each Defendant must submit a compliance notice, sworn under penalty of perjury, within 14 days of any change in the following:  Each Defendant must report any change in: (a) any designated point of contact; or (b) the structure of any Corporate Defendant or any entity that Defendant has any ownership interest in or controls directly or indirectly that may affect compliance obligations arising under this Order, including: creation, merger, sale, or dissolution of the entity or any subsidiary, parent, or affiliate that engages in any acts or practices subject to this Order.

C.     Each Defendant must submit to the Commission notice of the filing of any bankruptcy petition, insolvency proceeding, or similar proceeding by or against such Defendant within 14 days of its filing.

D.     Any submission to the Commission required by this Order to be sworn under penalty of perjury must be true and accurate and comply with 28 U.S.C. § 1746, such as by concluding: "I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on:_____" and supplying the date, signatory's full name, title (if applicable), and signature.

E.     Unless otherwise directed by a Commission representative in writing, all submissions to the Commission pursuant to this Order must be emailed to DEbrief@ftc.gov or sent by overnight courier (not the U.S. Postal Service) to: Associate Director for Enforcement, Bureau

of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC 20580. The subject line must begin: FTC v. Nexway AG.

## XII.    RECORDKEEPING

IT IS FURTHER ORDERED that Defendants must create certain records for 20 years after entry of the Order, and retain each such record for 5 years. Specifically, Corporate Defendants and Individual Defendant for any business that such Defendant, individually or collectively with any other Defendants, is a majority owner or controls directly or indirectly, must create and retain the following records:

A.    accounting records showing the revenues from all goods or services sold;

B.    personnel records showing, for each person providing services, whether as an employee or otherwise, that person's: name; addresses; telephone numbers; job title or position; dates of service; and (if applicable) the reason for termination;

C.    records of all consumer complaints, returned transactions, Chargebacks, and refund requests, whether received directly or indirectly, such as through a third party, and any response;

D.    all records necessary to demonstrate full compliance with each provision of this Order, including all submissions to the Commission;

E.    a copy of each unique website, advertisement or other marketing material used by any Client; and

F.    Payment Processing records for each client showing what accounts were charged, debited or credited, and the total amount charged, debited or credited on a monthly basis; and the contract between the Merchant and each consumer.

## XIII.    COMPLIANCE MONITORING

IT IS FURTHER ORDERED that, for the purpose of monitoring Defendants' compliance with this Order and any failure to transfer any assets as required by this Order:

A.    Within 14 days of receipt of a written request from a representative of the Commission, each Defendant must: submit additional compliance reports or other requested information, which must be sworn under penalty of perjury; appear for depositions; and produce documents for inspection and copying. The Commission is also authorized to obtain discovery, without further leave of court, using any of the procedures prescribed by Federal Rules of Civil Procedure 29, 30 (including telephonic depositions), 31, 33, 34, 36, 45, and 69.

B.    For matters concerning this Order, the Commission is authorized to communicate directly with each Defendant.  Defendant must permit representatives of the Commission to interview any employee or other person affiliated with any Defendant who has agreed to such an interview. The person interviewed may have counsel present.

C.    The Commission may use all other lawful means, including posing, through its representatives as consumers, suppliers, or other individuals or entities, to Defendants or any individual or entity affiliated with Defendants, without the necessity of identification or prior notice. Nothing in this Order limits the Commission's lawful use of compulsory process, pursuant to Sections 9 and 20 of the FTC Act, 15 U.S.C. §§ 49, 57b-1.

D.    Upon written request from a representative of the Commission, any consumer reporting agency must furnish consumer reports concerning Individual Defendants, pursuant to Section 604(1) of the Fair Credit Reporting Act, 15 U.S.C. §1681b(a)(1).

## XIV.   RETENTION OF JURISDICTION

IT IS FURTHER ORDERED that this Court retains jurisdiction of this matter for purposes

of construction, modification, and enforcement of this Order.

**SO ORDERED this _____ day of _____, 2022.**

_____

**UNITED STATES DISTRICT JUDGE**

**SO STIPULATED AND AGREED:**


**FOR PLAINTIFF UNITED STATES OF AMERICA**

BRIAN M. BOYNTON
(D.C. Bar No. 483187)
Principal Deputy Assistant Attorney General Civil Division

ARUN G. RAO
Deputy Assistant Attorney General

AMANDA N. LISKAMM
Director
Consumer Protection Branch

LISA K. HSIAO
(D.C. Bar No. 444890)
Assistant Director
Consumer Protection Branch

 /s/ Claude F. Scott
CLAUDE F. SCOTT
(D.C. Bar No. 414906)
Senior Litigation Counsel
Consumer Protection Branch
U.S. Department of Justice
450 5th Street, N.W.
Washington, D.C. 20530
Tel: 202-514-9471
Fax: 202-514-8742
Claude.F.Scott@usdoj.gov

**DEFENDANT NEXWAY INC.**

_____    Date: 1/12/2023 ____

Svetlana von Wenden, Director and CEO
Nexway, Inc.

**DEFENDANT NEXWAY SASU**

_____    Date: 1/12/2023 _____

Svetlana von Wenden, Permanent Legal Representative
of Nexway Group AG, President of the Company

**DEFENDANT NEXWAY GROUP AG**

_____    Date: 1/12/2023 ___

Svetlana von Wenden, Member of the Board of Directors
Nexway Group AG

**DEFENDANT VICTOR IEZUITOV**

Victor Iezuitov _____    Date: 1/11/2023 ____

Victor Iezuitov

**COUNSEL FOR DEFENDANTS NEXWAY INC., NEXWAY SASU, NEXWAY GROUP AG,
AND VICTOR IEZUITOV**

_____    Date:_____

**DEFENDANT NEXWAY INC.**

I

DocuSigned by:

*L4id*

Date: 1/12/2023

**DEFENDANT NEXWAY SASU**

1  oocuSigned by:

Date: 1/12/2023

**DEFENDANT NEXWAY GROUP AG**

DocuSigned by:

Date: 1/12/2023

7D0A67A5EA994A2...

**DEFENDANT VICTOR IEZUITOV**

DocuSigned by:

V'td-bl" l!')Wft.:

Date: 1/11/2023

E66726F2D604468

Victor Iezuitov

**COUNSEL FOR DEFENDANTS NEXWAY INC., NEXWAY SASU, NEXWAY GROUP AG, AND VICTOR IEZUITOV**

Date: 1/13/23

Laura Riposo VanDruff, Partner
Kelley Drye & Warren LLP